**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **No. 10 CR 821-1** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **JOHN SULLIVAN,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **DIANE SULLIVAN and DIANE** | ) | |
| **SULLIVAN, TRUSTEE OF THE** | ) | |
| **JOSEPH J. SULLIVAN TRUST,** | ) | |
| | ) | |
| **Third-Party Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

This is a petition brought by the U.S. Government pursuant to Federal Rule of Civil

Procedure 69, and the Federal Debt Collection Procedure Act, 28 U.S.C. § 3001 *et seq.*

("FDCPA"), seeking relief against Diane Sullivan ("Ms. Sullivan") individually and as Trustee

of the Joseph John Sullivan Trust, in order to aid in the execution of a criminal restitution

judgment that this Court entered against her ex-husband John Sullivan ("Mr. Sullivan"). In

response to the United States' petition, Ms. Sullivan requests that the Court dismiss the petition

pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6), and 12(b)(7), or, in the alternative,

conduct an evidentiary hearing on the allegations contained in the petition. (R. 383, Resp. at 1.)

For the reasons explained below, Ms. Sullivan's motion to dismiss and request for an evidentiary

hearing are denied.

# BACKGROUND

## I.    Underlying Criminal Proceedings Against John and Daniel Sullivan

John Sullivan and Daniel Sullivan "are brothers who owned a group of companies that offered remodeling services to homeowners: New Look Home Services, J & D Home Services, A-Z Home Services, and Contract Services." *United States v. Sullivan*, 765 F.3d 712, 714 (7th Cir. 2014). While the Sullivan brothers "provided honest work on construction jobs when their clients paid in cash," they engaged in an illegal scheme to defraud homeowners who secured loans to remodel their homes. *Id.* Specifically, "[b]y promising homeowners that they could remodel their homes at a discount, the appellants duped numerous people into refinancing their homes and paying the loan proceeds directly to one of the[ir] . . . companies." *Id.* With the loan funds in hand, the brothers "left the job sites unfinished and the homeowners' finances in disrepair." *Id.* To perpetuate their scheme, the Sullivans "targeted neighborhoods on the South and West sides of Chicago." *Id.* Daniel Sullivan told one of their telemarketers who would cold-call homeowners to look for "elderly, ignorant homeowners," and Mr. Sullivan added that "[t]he more ignorant, the better. Also, the older, the better." *Id.* Once a lead was secured through mass-advertisements, one of the brothers would visit the homeowners or would send one of their salesmen. *Id.* at 715. If a homeowner agreed to the remodeling services, Mr. Sullivan would often have the customers "sign blank contracts." *Id.* In addition, the brothers would refer the homeowners to specific loan officers in order to complete the refinancing. *Id.* As part of the refinancing, they "required the homeowners to sign letters of direction, so the title companies sent checks directly to [their] . . . companies," and also "required homeowners to sign over the checks because they needed payment before the remodeling work could begin." *Id.* While subcontractors would begin some of the work, the Sullivans abandoned the jobs before

2

completion. *Id.* From 2002 to 2006, the Sullivans "collected over $1.2 million from over forty homeowners who were victims of the scheme." *Id.*

In January 2011, a grand jury returned an indictment charging Daniel and John Sullivan with wire fraud in violation of 18 U.S.C. § 1343. *Id.* Following a trial, a jury found John and Daniel Sullivan guilty of two counts of wire fraud each. *Id.* On November 13, 2012, this Court sentenced each of them to 168 months' imprisonment and ordered them to pay restitution in the amount of $710,783.33. (R. 305, Sentencing Order; *see also* R. 304, Sentencing Order, *United States v. Daniel Sullivan*, 10-CR-00821-2 (N.D. Ill.).) On appeal, they challenged their sentences. *Sullivan*, 765 F.3d at 715. On August 28, 2014, the Seventh Circuit affirmed this Court's sentence, including the loss calculation, on all grounds. *Sullivan*, 765 F.3d 720.

## II.     Petition for Relief Against Ms. Sullivan

On June 20, 2014, as part of its efforts to collect the restitution owed by Mr. Sullivan, the government filed this petition for relief against his ex-wife, Ms. Sullivan. (R. 374, Pet.)

The government alleges that on March 6, 2000, Mr. Sullivan and his then-wife, Ms. Sullivan, established the Joseph John Sullivan Trust (the "Trust"). (*Id.* ¶ 23; *see also* 374-1, Ex. A, Decl. of Trust.) The Trust named Mr. and Ms. Sullivan as donors and Mr. Sullivan as trustee. (*Id.* ¶ 24.) Their son, Joseph Sullivan ("Joseph"), was the sole beneficiary. (R. 374, Pet. ¶ 28.) The government alleges that the Trust was "funded with income and proceeds from" Mr. Sullivan's businesses, and that Ms. Sullivan "has not been employed since 1994." (*Id.* ¶ 26.) The Trust "provided that during the lifetimes of the Donors, John Sullivan and Diane Sullivan, the Trustee, John, may pay to the Donors all of the net income of the Trust and such part of the principal as the Donors may request." (*Id.* ¶ 29.) The Trust also provided that "the Donors

reserved the right to revoke, alter, or amend the Trust, in whole or in part, at any time." (*Id.* ¶ 30.) The Sullivans divorced in 2003. (*Id.* ¶ 25.)

Beginning in December 1999, customers started to bring a series of lawsuits against Mr. Sullivan and one of his businesses, New Look Home Services. (*Id.* ¶¶ 31-34.) The lawsuits were filed, among other locations, in Cook County and the U.S. District Court for the Northern District of Illinois. (*Id.* ¶ 31.) The complaints sought injunctive relief and damages that they suffered as a result of Mr. Sullivan's fraud. (*Id.*) In addition, in 2003, the State of Illinois brought a criminal action against John and New Look Home Services, alleging fraud in connection with the home repair business and numerous violations of city and state regulations. (*Id.* ¶ 35.)

The government alleges that "[s]hortly after the filing of the criminal action by the State of Illinois, the Trust was amended and the Trustee of the Trust was changed to Diane." (*Id.* ¶ 36.) Specifically, in a handwritten document, allegedly signed on February 14, 2003, John resigned as a donor of the Trust and disclaimed any interest in the Trust. (*Id.* ¶ 37; *see also* R. 374-1, Ex. B, Resignation.) On the same date, the Trust was allegedly amended and Diane was named as the trustee of the Trust, and she was also added as a beneficiary of the Trust, in addition to Joseph. (R. 374, Pet. ¶ 38.)

Despite the fact that Mr. Sullivan resigned as donor of the Trust and disclaimed any interest in the Trust, the government alleges that Mr. Sullivan has always had "unfettered access to the Trust assets." (*Id.* ¶ 40.) The government claims that Mr. Sullivan continued to make "numerous deposits and withdrawals from the account after the disclaimer." (*Id.*) The government also claims that when "making withdrawals from the Trust bank accounts, John would endorse checks as Joseph Sullivan, but present his driver's license as identification"; the government alleges that Mr. Sullivan's middle name is Joseph and, in 2010, his son Joseph was a

4

minor and did not have a driver's license. (*Id.* ¶¶ 40-43(a)-(h).) The petition outlines at least eight instances between 2008 and 2010 when Mr. Sullivan allegedly withdrew money from the Trust in amounts ranging from $500 to $100,000. (*Id.* ¶ 43(a)-(h).) The government further alleges that Mr. Sullivan continues to enjoy the benefits of the Trust assets while incarcerated. From January 5, 2012, to May 25, 2013, the government claims that Ms. Sullivan has deposited a total of $1,366.05 to Mr. Sullivan's Bureau of Prisons account. (*Id.* ¶ 44.)

On September 28, 2010, the State of Arizona seized a total of $1,024,585.46 from three separate accounts bearing the account name of the "John Sullivan Revocable Trust." (*Id.* ¶ 46.) The government alleges that the probable cause for the seizure was the theft of $645,000 from one of Mr. Sullivan's fraud victims. (*Id.*) Two years after the seizure, Ms. Sullivan, Joseph, and the State of Arizona entered into a stipulation of judgment, "which provided that $645,000 from the seized funds was to be transferred to [the fraud victims] . . . , and released from the forfeiture and that the remaining seized funds would be dismissed from the action." (*Id.* ¶ 49.) Shortly thereafter, the Maricopa County Attorney's Forfeiture Division issued a check made payable to "Diane Sullivan and . . . Anthony Knowles, attorney for Diane Sullivan, Joseph John Sullivan, and The Joseph John Sullivan Revocable Trust" in the amount of $898,098.16. (*Id.* ¶ 50; *see also* R. 374-1, Ex. I, Copy of Check.) On December 4, 2012, Ms. Sullivan's attorney issued a check in the amount of $542,839.51 payable to Ms. Sullivan and the Trust. (R. 374, Pet. ¶ 51.) While the funds were originally seized from the Trust checking accounts, Ms. Sullivan deposited the $542,839.51 check directly "into an account in the name of Diane Sullivan." (*Id.* ¶¶ 51-52.)

Based upon documents produced pursuant to subpoenas and Ms. Sullivan's deposition testimony, on March 7, 2013, "the United States began supplementary proceedings, pursuant to section 2-1402 of the Civil Practices Law (735 ILCS 5/2-1402)." (*Id.* ¶ 54.) A third-party citation

to discover assets (the "Citation") was issued to Ms. Sullivan, and served upon her and her counsel. (*Id.* ¶ 54.) Ms. Sullivan did not respond or object to the Citation. (*Id.* ¶ 56.) On September 27, 2013, an amended third-party citation to discover assets (the "Amended Citation") was issued "to Diane, as Nominee for John Sullivan, and as Trustee of the Joseph John Sullivan Trust," and served upon Ms. Sullivan's counsel. (*Id.* ¶ 57.) In the cover letter to the Amended Citation, the government informed Ms. Sullivan that:

> The United States contends that John Sullivan, in an attempt to conceal property from the United States and other creditors, fraudulently transferred property to the Joseph John Sullivan Trust and ultimately to Diane, individually. As such, Diane is the nominee of John Sullivan. Accordingly, when the United States served the Citation to Discover Assets on Diane, the citation created a lien on all property Diane is holding on behalf of, or as nominee for, John Sullivan, including the account at Wells Fargo Bank. Therefore, any attempt to remove/withdraw funds from the account or otherwise transfer the property in derogation of the United States' lien may subject Ms. Sullivan and/or the transferee to liability.

(R. 374-1, Ex. K, Cover Letter to Am. Citation.) The government asserts that Ms. Sullivan has not responded to the Amended Citation. (R. 374, Pet. ¶ 59.)

As a result of the above events, on June 20, 2014, the government filed a four-count civil petition against Ms. Sullivan. (R. 374, Pet.) The petition alleges: (1) that the Trust is the alter ego of Mr. Sullivan; (2) that Ms. Sullivan is Mr. Sullivan's nominee; (3) fraudulent transfer of funds in violation of Section 3304(a) of the FDCPA; and (4) fraudulent transfer of funds in violation of Section 3304(b)(1) of the FDCPA. (*Id.* ¶¶ 62-87).

In response, Ms. Sullivan argues that the petition should be dismissed because it fails to join Joseph as an indispensable party, it is factually insufficient, and it fails to meet the heightened pleading standard employed when allegations of fraud are pled. (R.

383, Resp. at 1.)[1] In addition, Ms. Sullivan filed an "Answer to United States' Petition for Relief Against Diane Sullivan, Individually And As Trustee of the Joseph J. Sullivan Trust," (*id.* at 13-42), and further "requests an evidentiary hearing on the allegations contained in the Petition as that Petition is replete with factual issues that can only be properly decided following a full evidentiary hearing," (*id.* at 2; *see also id.* at 42-47). The government filed its reply on September 10, 2014. (R. 398, Reply.)

## LEGAL STANDARD

A motion under Rule 12(b)(7) seeks dismissal based on the failure to join a party as required by Rule 19. FED. R. CIV. P. 12(b)(7). "The purpose of Rule 19 is to permit joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources." *Askew v. Sheriff of Cook Cty.*, 568 F.3d 632, 634 (7th Cir. 2009) (citation and internal quotation marks omitted). "On a Rule 12(b)(7) motion, the movant bears the burden of demonstrating that the absent party is a necessary and indispensable party that must be joined." *Ochs v. Hindman*, 984 F. Supp. 2d 903, 906 (N.D. Ill. 2013). Similar to a Rule 12(b)(6) motion, the court accepts all well-pleaded allegations in the complaint as true but may consider extrinsic evidence. *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 480 n.4 (7th Cir. 2001). Finally, the U.S. Court of Appeals for the Seventh Circuit has cautioned that dismissal for failure to join a party "is not the preferred outcome under the Rules." *Askew*, 568 F.3d at 634.

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Kubiak v. City of Chi.*, 810 F.3d 476, 480-81 (7th Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[1] Ms. Sullivan also requests a stay pending the resolution of Mr. Sullivan's appeal. (*Id.* at 1, 11-13.) However, the Seventh Circuit has now affirmed Mr. Sullivan's sentence, *Sullivan*, 765 F.3d at 720, and therefore her request for a stay has become moot.

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted).

At the motion to dismiss stage, the Court may consider the complaint itself, "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). When a party presents materials that are not attached to or referred to in the complaint, the court has discretion to exclude the materials or to consider the materials and convert the motion to dismiss to a motion for summary judgment. FED. R. CIV. P. 12(d).[2]

In pleading fraud in federal court, Rule 9(b) imposes a higher pleading standard than that required under Rule 8(a)(2). *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736-37 (7th Cir. 2014); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011). Rule 9(b) requires that a party alleging fraud "must state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The Seventh Circuit has interpreted this rule to require "describing the 'who, what, when, where, and how' of the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011). However, "[m]alice,

---

[2] Ms. Sullivan attaches eleven exhibits to the response. (R. 385-397, Exs. A-K.) In reply, the government "requests that the Court exercise its discretion to exclude this additional evidence submitted by Respondent when ruling on Respondent's motion to dismiss or in the alternative, if converted to a motion, that the court set a discovery schedule and give the parties a reasonable opportunity to submit all materials pertinent to the motion." (R. 398, Reply at 2.) As a preliminary matter, it does not appear that Ms. Sullivan is relying upon the exhibits in support of her argument that the petition should be dismissed; rather, the exhibits are relied upon in support of her separate request for an evidentiary hearing. The Court declines to convert the motion to dismiss into a motion for summary judgment and, therefore, Ms. Sullivan's exhibits will not be considered when determining the motion to dismiss. *See Hecker*, 556 F.3d at 583.

intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). "Heightened pleading in the fraud context is required in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013) (citation omitted). The Seventh Circuit "ha[s] also cautioned, however, that the exact level of particularity that is required will necessarily differ based on the facts of the case." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

### I.      Failure to Join Indispensable Party

Ms. Sullivan argues that the petition should be dismissed because the government fails to join one of the co-beneficiaries of the Trust—Joseph—to this action. (R. 383, Resp. at 2-4.) Specifically, Ms. Sullivan asserts that Joseph must be included in this action, and "[a]ny determination by this Court that would grant the relief requested . . . would certainly deprive Joseph J. Sullivan of a significant amount of current property as well as future income." (*Id.* at 2-3.) In addition, Respondent claims that "[a]ny determination rendered by this Court will undoubtedly lead to inequitable results for Joseph." (*Id.*) Thus, Ms. Sullivan requests that the Court dismiss the petition for failure to join Joseph or, in the alternative, stay the case pending the joining of Joseph to this action. (*Id.* at 4.)[3]

---

[3] The government's reply focuses largely on whether Ms. Sullivan, as trustee of the Trust, is the proper party to be sued in this action under Rule 17(a). (R. 398, Reply at 4-5.) Indeed, the government is correct that the trustee of the Trust is a proper party to this action. *See In re Schneider*, 417 B.R. 907, 913 (Bankr. N.D. Ill. 2009) ("The party with legal title to the corpus of the trust, the trustee is the proper party to be sued as transferee in fraudulent transfer claims." (citation omitted)); *see also* 760 ILL. COMP. STAT. 5/4.11 (Under the Illinois Trusts and Trustees Act, a trustee has the power to "contest . . . claims or other charges in favor of or against the trust estate."). However, the government does not directly address whether Joseph, as one of only two beneficiaries of the Trust, is a necessary and indispensable party under Rule 19. A necessary or indispensable party under Rule 19 is distinct from a real party in interest under Rule 17(a). As such, the government's reply is of little assistance to the Court on this issue.

To evaluate a Rule 12(b)(7) motion, the Court must engage in a two-step analysis.[4] First, the Court must determine whether the absent party is necessary under Rule 19(a)—or per the Rule's term, "required to be joined if feasible." *Askew*, 568 F.3d at 635 (quoting Rule 19(a)). If the party is necessary but joinder is not feasible, the Court then evaluates whether the party is indispensable. *Id.* (addressing Rule 19(b)). If the Court finds the absent party is not necessary, it need not proceed to the next step of the analysis. *Askew*, 568 F.3d at 635.

Courts have repeatedly held that in suits by third parties brought against the trust property, where there is no conflict of interest between the trustee and the beneficiary, a suit against the trustee is proper and the beneficiary is not a necessary party. *See, e.g., Markham v. Fay*, 74 F.3d 1347, 1355 (1st Cir. 1996) ("The general rule is, that in suits respecting trust-property, brought either by or against the trustees, the *cestuis que trust* as well as the trustees are necessary parties. An exception to the general rule, however, exists when the trustee represents the beneficiaries' interests fully and without conflict." (internal citations and quotation marks omitted)); *Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1521 (9th Cir. 1985) ("It has long been the rule that beneficiaries of a trust ordinarily need not be joined as necessary parties under Rule 19."); *In re Miller*, 148 B.R. 510, 523-25 (Bankr. N.D. Ill. 1992) (where the trustee properly represents the beneficiaries' interests, the beneficiaries need not be made parties to an action to set aside a fraudulent conveyance); *Anderson v. Elliott*, 117 N.E.2d 876, 879 (Ill. App. Ct. 1954) ("Where . . . the litigation does not concern the right of the trustee and the *cestuis*, as between themselves, in any way, the *cestuis* are not necessary parties."); George Gleason Bogert et al., THE LAW OF TRUSTS AND TRUSTEES § 593 (2015) ("The earlier equity rule was that the beneficiary was

---

[4] While the response never explicitly invokes Rule 12(b)(7) or Rule 19, Ms. Sullivan plainly argues that the petition should be dismissed because it fails to "join an indispensable party" (R. 383, Resp. at 2); thus, the Court will construe this as a request for dismissal under Rule 12(b)(7).

always a necessary party, but the present position of the courts is that the trustee may represent

the beneficiary in all actions relating to the trust, if rights of the beneficiary as against the trustee,

or the rights of the beneficiaries among themselves, are not brought into question.").

Ms. Sullivan does not argue that a conflict of interest exists between Joseph and her.

Notably, Ms. Sullivan is not only the trustee, but she is also the other beneficiary of the Trust.

(R. 374, Pet. ¶ 38.) As co-beneficiary and trustee, she has a significant interest in the Trust. Ms.

Sullivan also fails to argue how she is not adequately representing Joseph's interest in this

lawsuit. Not only does it appear that Ms. Sullivan and Joseph have a shared interest in this

dispute, but Ms. Sullivan is mounting a defense on behalf of both of the beneficiaries. Ms.

Sullivan has hired counsel and her counsel is vigorously arguing for the interests of the trustee,

the trust, and the beneficiaries alike. In addition, despite the fact that the government's petition

has been pending for nearly two years, Joseph has not given the Court the slightest hint of an

interest in participating in this dispute.[5]

---

[5] In support of Ms. Sullivan's argument that the petition should be dismissed for failure to join Joseph, the response cites to a handful of cases that are outside of the Seventh Circuit and/or factually distinguishable. (R. 383, Resp. at 3-4.) Specifically, these cases do not assist the Court because not a single one of them involves the determination of whether a beneficiary of a trust is an indispensable party under Rule 19 when there is no conflict of interest between the beneficiary and the trustee. *See Evergreen Park Nursing & Convalescent Home, Inc. v. Am. Equitable Assurance Co.*, 417 F.2d 1113 (7th Cir. 1969) (affirming dismissal of action when joinder of insurance companies would destroy diversity jurisdiction and all of the insurance companies were necessary parties to properly resolve all issues as to liability in a consistent manner and in one action rather than two lawsuits); *Eads v. Sayen*, 281 F.2d 791 (7th Cir. 1960) (affirming dismissal of lawsuit because airline pilot association was a necessary party to the action but could not be joined because unincorporated association could not be sued as an entity under Illinois law); *Jenkins v. Reneau*, 697 F.2d 160 (6th Cir. 1983) (plaintiff's sister was an indispensable party to legal malpractice action because she was a party to the contract for legal services); *Allen ex rel. Allen v. Devine*, 726 F. Supp. 2d 240, 256-57 (E.D.N.Y. 2010) (dismissing constructive trust claim in fraud and RICO action because joinder of indispensable party—who held the assets at issue in his possession—destroyed diversity jurisdiction); *R. J. Williams Co. v. Fort Belknap Hous. Auth.*, 92 F.R.D. 17, 21-22 (D. Mont. 1981) (contracting company was necessary party to action against tribal housing authority when the company had "an interest in the property attached and should be joined in order to adequately protect that interest"); *Fletcher Aircraft Co. v. Bond*, 77 F.R.D. 47 (C.D. Cal. 1977) (transferee of Federal Aviation Administration Aircraft Type Certificate was an indispensable party in action against FAA employees for injunction and declaratory judgment contending that transfer of the certificate to another

Put simply, Ms. Sullivan does not demonstrate why Joseph must be joined in this action when Ms. Sullivan is already protecting his interest in the Trust. Thus, absent a conflict of interest between Ms. Sullivan as trustee and co-beneficiary and Joseph as co-beneficiary, Joseph is not a necessary party to this action under Rule 19(a). *See, e.g., Murphy v. Am. Gen. Life Ins. Co.*, 74 F. Supp. 3d 1267, 1282-83 (C.D. Cal. 2015) (concluding that beneficiary was not a necessary party under Rule 19(a) because, among other factors, plaintiff was unable to establish that a conflict of interest existed). Because the Court determines that Joseph is not a necessary party under Rule 19(a), there is no need to determine whether he is indispensable under Rule 19(b). Therefore, Ms. Sullivan's request to dismiss the petition for failure to join an indispensable party is denied.

## II.   FDCPA Claims

Next, Ms. Sullivan argues that the government's FDCPA claims fail under Rule 9(b). (R. 383, Resp. at 4-9.) "The Mandatory Victims Restitution Act (MVRA) requires a defendant convicted of certain crimes, 'including any offense committed by fraud or deceit,' to make restitution to the victims of the offense in an amount equal to the value of the property damaged or lost." *United States v. Hosking*, 567 F.3d 329, 331 (7th Cir. 2009) (quoting 18 U.S.C. § 3663A(a)(1), (b)(1), (c)(1)(A)(ii)). "The MVRA's overriding purpose is to compensate victims for their losses." *United States v. Robers*, 698 F.3d 937, 943 (7th Cir. 2012) (citation and internal quotation marks omitted). The MVRA also provides the government with authority to enforce victim restitution orders in the same manner that it recovers fines and by all other available and reasonable means. 18 U.S.C. § 3664(m)(1)(A)(i)-(ii). The government is authorized under 18 U.S.C. § 3613(a) to collect criminal fines and restitution "in accordance

corporation was not proper); *Ford v. Adkins*, 39 F. Supp. 472 (E.D. Ill. 1941) (property owner that executed warranty deed regarding gas and oil rights twenty years prior to the action was not an indispensable party).

with the practices and procedures for the enforcement of a civil judgment under Federal law or State law." 18 U.S.C. § 3613(a), (f).

In addition, when a defendant is convicted of a crime and ordered to pay restitution under the MVRA, a lien—akin to a federal tax lien—arises and is automatically and statutorily imposed on all of the defendant's property for collection of the outstanding debt. *See* 18 U.S.C. § 3613(c) ("A[n] order of restitution . . . is a lien in favor of the United States on all property and rights to property of the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986."); *see also United States v. Tyson,* 265 F. Supp. 2d 788, 791 (E.D. Mich. 2003) ("Therefore, under Section 3613(c), the restitution at issue in the case at bar must be treated not 'similar' to a tax lien, but 'as if' it were a tax lien."). Congress intended federal tax liens "to reach every interest in property that a taxpayer might have." *United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 720 (1985). A federal tax lien may reach a taxpayer's interest in "property or rights to property" to the extent applicable state law recognizes the subject interest as property. *Id.* at 722.

The FDCPA provides the practices and procedures for the enforcement of a judgment. 28 U.S.C. §§ 3001-3308 (2016). The purpose of the FDCPA was "to create a comprehensive statutory framework for the collection of debts owed to the United States government, in order to improve the efficiency and speed in collecting those debts." *N.L.R.B. v. E.D.P. Med. Comput. Sys., Inc.,* 6 F.3d 951, 954 (2d Cir. 1993) (citation and internal quotation marks omitted). To this end, the FDCPA provides a mechanism to collect post-judgment debts, and specifically provides the United States with a civil cause of action when a debtor fraudulently transfers property either before or after the debt is incurred. *See* 28 U.S.C. § 3304.

The government alleges claims against Ms. Sullivan for fraudulent transfer under the FDCPA. Section 3304(a)(1) focuses on the transfer of assets after a debt to the United States has been incurred. Section 3304(a)(1) provides:

> [A] transfer made . . . by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred if . . . the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and . . . the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer[.]

28 U.S.C. § 3304(a)(1).

Section 3304(b) focuses on the transfer of assets "without regard to date of judgment." 28 U.S.C. § 3304(b). Section 3304(b)(1) provides that "a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation" "with actual intent to hinder, delay, or defraud a creditor[.]" 28 U.S.C. § 3304(b)(1)(A). A transfer is also considered fraudulent under Section 3304(b) if the debtor transfers property "without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor . . . intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 28 U.S.C. § 3304(b)(1)(B). The government alleges that Sections 3304(a), 3304(b)(1)(A), and 3304(b)(1)(B) apply here. (R. 374, Pet. ¶¶ 73-87.)

Ms. Sullivan argues that the government's FDCPA claims fail under Rule 9(b) and should be dismissed because the allegations are "conclusory and rest upon the nebulous '[u]pon information and belief,'" (R. 383, Resp. at 5), and "there are no allegations pled with any factual specificity regarding the key details of any alleged fraudulent conduct relating to the Joseph J. Sullivan Trust," (*id.* at 6).

The purpose of Rule 9(b) is to ensure that allegations of fraud are grounded in adequate pre-filing investigation. *See Pirelli*, 631 F.3d at 441. In support of a fraud claim, a plaintiff "ordinarily must describe the 'who, what, when, where, and how' of the fraud—the first paragraph of any newspaper story." *Pirelli,* 631 F.3d at 441-442 (citation and internal quotation marks omitted). However, cautious of encouraging "an overly rigid view of the formulation," the Seventh Circuit has clarified that "the requisite information—what gets included in that first paragraph—may vary on the facts of a given case." *Id.* at 442. Generally, allegations of fraud made on "information and belief" do not meet the heightened particularity pleading standard of Rule 9(b) unless the plaintiff provides the grounds for his suspicions and the facts constituting the fraud are not accessible to the plaintiff. *Pirelli*, 631 F.3d at 442-43.

Ms. Sullivan is correct that the government pleads some of its allegations, and specifically its core claims contained in paragraph 43 of the petition, upon "information and belief." (R. 383, Resp. at 5.) In support of the claim that Mr. Sullivan continued to transfer property to the Trust and continued to enjoy the benefits of the property in the Trust, the government outlines a series of transactions in which it alleges, upon information and belief, that Mr. Sullivan signed, endorsed, or deposited checks into the Trust. (R. 374, Pet. ¶ 43(a)-(h).) However, these are not nebulous allegations and the government provides the specific grounds for its suspicions. For example, the petition alleges that on July 21, 2010, "a Trust check was made out to cash in the amount of $100,000 and bearing what purports to be the signature of Diane Sullivan was cashed"; the check was "purportedly endorsed by Joseph Sullivan, but the identification used to cash the check was John's driver's license." (R. 374, Pet. ¶ 43(g).) The government also alleges that Ms. Sullivan testified in her deposition that she did not sign the check, (*id.*), and Joseph was a minor at the time of this transaction and did not have a driver's

license, (*id.* ¶ 42). Thus, in light of these allegations, the government has a reasonable suspicion to believe that, on July 21, 2010, it was Mr. Sullivan who wrote the check for $100,000, signed Ms. Sullivan's name, endorsed the check with Joseph's name, and then withdrew $100,000 from the Trust account. The United States also provides similarly reasoned suspicions for a litany of other transactions in which Mr. Sullivan engaged. (R. 374, Pet. ¶ 43(a)-(h).) In addition, while the petition contains numerous details regarding the structure of the Trust and deposits and withdrawals made by Mr. and Ms. Sullivan, many of the facts constituting Ms. Sullivan's participation in the fraud are not accessible to the government because discovery is not yet complete. As such, the government's allegations based on information and belief are sufficient under Rule 9(b).

In addition, and contrary to Ms. Sullivan's arguments, the petition contains the traditional hallmarks and requisite details of a fraudulent conveyance claim. A fraudulent transfer claim under Section 3304(a)(1), in which a debt to the United States arose before the fraudulent transfer was made, requires a showing that the transfer was made without receiving reasonably equivalent value and the debtor was insolvent after the transfer. 28 U.S.C. § 3304(a)(1). Notably, there is no requirement under the statute that the government must plead intent to defraud. In support of its claim under Section 3304(a), the government alleges that "in December 2012, John, through the Trust, his alter ego, and Diane, his nominee, transferred at least $542,839.51 to Diane, individually." (R. 374, Pet. ¶ 74.) The judgment against Mr. Sullivan in this criminal case was entered on November 13, 2012. (*Id.* ¶ 75.) Therefore, when the transfer was made, the debt to the government already existed. (*Id.*) The transfer was made without the exchange of reasonably equivalent value. (*Id.* ¶ 76.) And the transfer allegedly left Mr. Sullivan insolvent and without assets to satisfy his restitution obligation. (*Id.* ¶ 77.)

A fraudulent transfer claim under Section 3304(b)(1)(A), in which a debt to the United States arises before or after a fraudulent transfer is made, requires that the debtor made a transfer "with actual intent to hinder, delay, or defraud a creditor." 28 U.S.C. § 3304(b)(1)(A). However, Rule 9(b) only requires that fraudulent intent "be alleged generally." FED. R. CIV. P. 9(b).[6] Similarly, a fraudulent transfer claim under Section 3304(b)(1)(B) requires that the debtor made a transfer "without receiving a reasonably equivalent value in exchange for the transfer" and the debtor "reasonably should have believed that he would incur debts beyond his ability to pay." 28 U.S.C. § 3304(b)(1)(B). When stating a claim under Section 3304(b)(1)(A), the government alleges that the Trust was established in an attempt to hide income and assets, and that the transfers were made with the "actual intent to hinder, delay, and defraud . . . [the] victims of [Mr. Sullivan's] crime that are due restitution." (R. 375, Pet. ¶¶ 79-80.) When stating its claim under Section 3304(b)(1)(B), the government also alleges that Mr. Sullivan made the transfers "without receiving reasonably equivalent value," and that he made the transfers when he believed that "he would incur debts beyond his ability to pay." (*Id.* ¶ 81-82.) The government further claims that Mr. Sullivan retained control over the Trust assets throughout the relevant time period. (*Id.* ¶ 84.) Finally, the government alleges that Ms. Sullivan assisted Mr. Sullivan in his actions. (*Id.* ¶ 87.)

In support of all of its FDCPA claims, the government provides a detailed and chronological recitation of the facts and identifies all of the relevant fraudulent transactions, including the specific dates of the transfers it claims to be fraudulent, the recipients of those transfers, and their amounts. In addition, the government cites and includes as exhibits to the petition Trust documents, court filings, declarations, and deposited checks. (R. 374-1, Ex. A-K.)

---

[6] *See also* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1301 (3d ed.) (noting that the second sentence of Rule 9(b) "suggests that the draftsmen felt a need to . . . insure that [the Rule] was not interpreted to require a party pleading fraud . . . to allege the specific circumstances of fraudulent intent").

Put simply, the petition properly alleges the "who, what, when, where, and how" of the allegedly fraudulent transfers and contains sufficient details to give Ms. Sullivan fair notice of what the government's fraud claim is and the grounds upon which it rests. *See Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079-80 (7th Cir. 1997) (finding that claim for fraudulent conveyance was alleged with requisite particularity under Rule 9(b) where it included the date and conditions under which the defendants became indebted to the plaintiff, the amount due, and the events surrounding the defendants' conveyance of property); *FirstMerit Bank, N.A. v. Hosseini*, No. 14 C 8749, 2015 WL 4243484, at *10 (N.D. Ill. July 13, 2015) ("Taken together, the Court finds that these allegations suffice to state a claim for fraudulent transfer, providing the who, what, when, where, and how of the fraud."); *In re Grube*, 500 B.R. 764, 776-77 (Bankr. C.D. Ill. 2013) (concluding that fraudulent transfer claim was pleaded with requisite particularity when trustee alleged the challenged transfers "by date and amount" and also alleged facts in support of "several badges of fraud" to support inference that challenged transfers were made with actual intent to hinder, delay, or defraud creditors); *United States v. Bame*, 778 F. Supp. 2d 988, 992 (D. Minn. 2011) (denying defendant's motion to dismiss and concluding that the government's FDCPA claim was pled with particularity under Rule 9(b)); *United States v. Zabka*, No. 10-1078, 2010 WL 2985356, at *3 (C.D. Ill. July 27, 2010) ("The Government has provided the Defendants with notice of its claim, including sufficiently particular description of the circumstances constituting the alleged fraud by alleging that no consideration was given in exchange for The Properties, the transfers were made in anticipation of liens, and that the Zabkas became insolvent as a result of the transfers.").

Ms. Sullivan argues that the government's fraud claims leave out a plethora of required facts. Specifically, Ms. Sullivan argues that the petition "fails to establish the relevant time

frame" and fails to allege that "there was fraudulent conduct in the amending of the trust to remove John Sullivan as Trustee," or that there was "fraud in the administering of the trust." (R. 383, Resp. at 6-7.) In addition, Ms. Sullivan argues that the petition fails to identify any "specifics" of the allegedly fraudulent payments and makes the "improper and conclusory claim[] that all the Trust assets were contributed by John Sullivan." (*Id.* at 7-8.) Ms. Sullivan also argues that there are no facts alleged to demonstrate "a close relationship between Diane . . . and John . . . during a period of time where they were divorced." (*Id.* at 8.) Some of Ms. Sullivan's assertions are plain wrong. For example, the petition does articulate the relevant time period and does set out the specifics of the fraudulent payments. (R. 374, Pet. ¶¶ 43(a)-(h), 44, 46-52.) In yet another example, the government does allege facts to support that the assets in the Trust came entirely from Mr. Sullivan. Specifically, the government claims that Mr. Sullivan and Ms. Sullivan were the only individuals listed as the donors of the Trust, Ms. Sullivan had not worked in over twenty years and, prior to his fraud conviction, Mr. Sullivan had been employed. (*Id.* ¶ 24, 26.) In addition, it is unclear why Ms. Sullivan believes that the government must plead these specific facts, such as how close of a relationship Mr. Sullivan and Ms. Sullivan had after their divorce, to support its fraudulent transfer claims. Indeed, Ms. Sullivan does not cite to a single case that demonstrates that these facts (as opposed to the facts alleged by the government) are required when pleading fraudulent conveyance claims under the FDCPA. The Court declines to impose a pleading standard that would stretch the bounds of Rule 9(b) beyond its well-established limits.

The Court finds that the allegations in the petition are sufficient to satisfy the heightened pleading requirements of Rule 9(b). Thus, Ms. Sullivan's request to dismiss the FDCPA claims is denied.

### III. Alter Ego and Nominee Claims

As to the government's claim that the Trust is Mr. Sullivan's alter ego and Ms. Sullivan is Mr. Sullivan's nominee, Ms. Sullivan argues that the petition should be dismissed under Rule 12(b)(6) because it "fails to make the necessary allegations that would establish why property held in Trust since 2000 and controlled since 2003 by Third-Party Ms. Sullivan for the benefit of her and her son, should be used to satisfy a judgment entered in November 2012 against her ex-husband of nine years." (R. 383, Resp. at 9.) Ms. Sullivan also argues that the petition contains conclusory assertions and legal conclusions. (*Id.* at 10.) The Court concludes that the government alleges far more than what Ms. Sullivan claims.

"Simply put, a nominee is a person who holds legal title to property for the benefit of someone else." *United States v. Towne*, 406 F. Supp. 2d 928, 937 (N.D. Ill. 2005). The "nominee theory is utilized to determine whether property should be construed as belonging to the taxpayer if he treated and viewed the property as his own, in spite of the legal machinations employed to distinguish legal title to the property." *United States v. Olsen*, No. 98 C 2170, 2001 WL 817854, at *3 (N.D. Ill. July 19, 2001) (alterations and citation omitted). "In order to determine whether an individual is a nominee or alter ego of the taxpayer, courts have considered several common factors that indicate the property held by one party actually belongs to another." *Frese v. Smith*, No. 99-3128, 1999 WL 1251856, at *3 (C.D. Ill. Nov. 5, 1999) (citation and internal quotation marks omitted). These factors include whether: "(1) a close personal relationship exists between the nominee and the transferor; (2) the nominee paid little or no consideration for the property; (3) the parties placed the property in the name of the nominee in anticipation of collection activity; (4) the parties did not record the conveyance; and (5) the transferor continues to exercise dominion and control over property." *Towne*, 406 F. Supp. 2d at 937. "The key to the

20

Court's analysis under the Government's nominee theory is whether the transferor had control over the Property." *Towne*, 406 F. Supp. 2d at 937.

There is no independent legal cause of action for alter ego; however, alter ego is an equitable remedy for a specific theory of personal liability. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 737 (7th Cir. 2004) (holding that piercing the corporate veil under Illinois law is an equitable remedy); *Conopco, Inc. v. S.K. Foods*, No. 98 C 1882, 1999 WL 965554, at *3 (N.D. Ill. Sept. 30, 1999) ("The alter ego doctrine is an equitable remedy available where the party seeking the doctrine's benefits has some independent right to relief."). To state an alter ego or veil-piercing theory, "plaintiffs typically are only required to satisfy the notice pleading standards of Rule 8(a)." *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 913 (N.D. Ill. 2007). Indeed, "[w]here a claimant fairly alleges an entity exists as the alter ego of another and provides factual manifestations suggesting the existence that the two operate as a single entity, a motion to dismiss will be denied." *Keller Sys., Inc. v. Transp. Int'l Pool, Inc.*, 172 F. Supp. 2d 992, 1001 (N.D. Ill. 2001); *see also Hann v. Paul Revere Ins. Co.*, No. 03 C 1062, 2004 WL 557380, at *2 (N.D. Ill. Feb. 17, 2004) (stating that if a plaintiff alleges an alter ego relationship, "dismissal of her complaint is unwarranted if she alleges any facts which suggest that the corporations operated as a single entity").

The petition alleges that there is a close relationship between Mr. Sullivan, the donor and original trustee of the Trust, and Ms. Sullivan, the current trustee and co-beneficiary. (R. 374, Pet. ¶ 71.) In addition, the government claims that Ms. Sullivan has not worked since 1994, and the money from the Trust came entirely from Mr. Sullivan's fraudulent business activities. (*Id.*; *see also id.* ¶ 26.) The government also claims that the Trust was amended—in anticipation of the lawsuits filed against Mr. Sullivan—to add Ms. Sullivan as a beneficiary and trustee of the

Trust. (*Id.* ¶¶ 69-70.) Mr. Sullivan has also allegedly retained the benefits of the Trust, continued to control the Trust, used the Trust bank accounts as his own personal bank accounts with no restrictions, and commingled the Trust property with his own. (*Id.* ¶ 72.)

At bottom, the government sufficiently claims that Mr. Sullivan is using the Trust as an alter ego in order to avoid payment to the United States and the victims of his crimes, and also that, as Mr. Sullivan's nominee, Ms. Sullivan is holding Mr. Sullivan's ill-gotten property to further avoid payment to the government. *See, e.g., Zabka*, 2010 WL 2985356, at *4 (denying motion to dismiss and concluding that "[t]hrough its Complaint, the Government has put the Defendants on notice of its allegation that the Limited Partnerships are alter egos or nominees, and Defendants suggestion to the contrary must be denied at this time"); *Frese*, 1999 WL 1251856, at *4 (concluding that the government had sufficiently alleged alter ego and nominee claims when it alleged that "the nominee/alter ego paid little or no consideration for the property," that there was "a close personal relationship between the nominee and taxpayer," and that the defendants "continue to exercise dominion and control over the property, and continue to use and enjoy the benefits of the property as their own").

Put simply, it is reasonable to infer from the facts alleged in the petition that the Trust is Mr. Sullivan's alter ego and that Ms. Sullivan, as trustee of the Trust, is Mr. Sullivan's nominee.

These theories of recovery are plausible on their face and, therefore, the United States is entitled to proceed with its claims.[7]

## CONCLUSION

For the foregoing reasons, Ms. Sullivan's request to dismiss the petition (R. 383) is DENIED, and her request to stay the petition pending the resolution of John Sullivan's appeal (R. 383) is DENIED AS MOOT. In addition, Ms. Sullivan's request for an evidentiary hearing (R. 383) is DENIED; however, the parties may proceed with discovery. While Ms. Sullivan included her answer and affirmative defenses to the petition in her response, for clarity of the record, Ms. Sullivan must separately file her answer and any affirmative defenses to the government's petition on or before May 30, 2016. Finally, the United States and Ms. Sullivan shall appear for a status hearing on June 14, 2016, at 9:45 a.m., to propose an expedited discovery schedule.

ENTERED: _____

Chief Judge Rubén Castillo
United States District Court

Dated: April 21, 2016

---

[7] Finally, Ms. Sullivan spends six pages of her response disputing the facts alleged in the petition and arguing that she is entitled to an evidentiary hearing because "failure to provide . . . Respondent with an evidentiary hearing prior to entering any order affecting her property rights in the Trust would violate due process." (R. 383, Resp. at 42.) Ms. Sullivan does not cite to a single rule or case that supports her assertion that she is entitled to an evidentiary hearing at this juncture. The government does not respond directly to Ms. Sullivan's request for an evidentiary hearing, but does ask the Court to "set a discovery schedule" prior to ruling on any motion for summary judgment. (R. 398, Reply at 2.) Ms. Sullivan will be given an opportunity to contest these claims, but through the normal procedures set forth in the Federal Rules of Civil Procedure. Thus, while the Court declines to conduct an evidentiary hearing at this time, it will allow Ms. Sullivan to file her answer and affirmative defenses to the petition and permit the parties to engage in discovery.